UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DORTH RAPHAELY,

Plaintiff,

v.

GARTNER INC., et al.,

Defendants.

Case No.  20-cv-06166-DMR

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 32, 34

This is an action for severance benefits pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a), brought by Plaintiff Dorth Raphaely against his former employer, Gartner, Inc., and Gartner, Inc. Severance Plan.  Now before the court are the parties' cross motions for summary judgment.  [Docket Nos. 32 (Pl.'s Mot.), 34 (Defs.' Mot.).]  This matter is suitable for resolution without a hearing.  Civ. L.R. 7-1(b).  For the following reasons, Raphaely's motion is denied.  Defendants' motion is granted.

## I.     FACTS

The facts set forth below are undisputed unless otherwise stated.  Raphaely is a former employee of Gartner, Inc. ("Gartner") whose employment was terminated in November 2019.  The parties dispute his entitlement to severance benefits under the Gartner, Inc. Severance Plan ("Plan"), an ERISA-governed welfare benefit plan.  Defendants contend that Raphaely's employment was terminated for performance-related reasons, rendering him ineligible for severance benefits under the Plan.  Raphaely disputes that he was terminated for performance-related reasons and contends that he is entitled to severance benefits.

### A.     Employment with Gartner and Relevant Terms of the Plan

Gartner hired Raphaely in February 2019 as Group Vice President, Content Strategy at the base salary of $300,000 per year.  The position was based in Gartner's Austin, Texas office.

United States District Court
Northern District of California

[Docket No. 32-2 (Administrative Record, "A.R.") 67-68.]  His employment was covered by the Plan, a welfare benefit plan governed by ERISA that provides severance benefits to certain eligible employees upon their departure from Gartner.  A.R. 41-61.  The Plan is administered by "[t]he Gartner, Inc. Severance Plan Committee," which is comprised of Gartner's chief legal officer, chief human resources officer, and head of compensation and benefits.  A.R. 44, 48.

Article II of the Plan addresses payment of severance benefits and provides that Gartner "shall pay Severance to Severed Employees in accordance with [the Plan] . . ."  A.R. 53.  The Plan defines "severance" as "the income replacement benefits provided under the Plan to a Severed Employee in accordance with Article II."  A "Severed Employee" is "an Eligible Employee who has incurred a Covered Termination of Employment."  A.R. 51.  The Plan defines "Covered Termination of Employment" as "the cessation of an Employee's active service with the Employer, other than through the Employee's death, disability or retirement."  However, it also provides that "an Employee will not have a Covered Termination of Employment if the Employee voluntarily resigns or if the Employee is terminated by the Employer" for certain enumerated reasons, including "performance-related reasons."[1]  A.R. 49-50.  The Plan does not define "performance-related reasons."

---

[1] The full text of the "Covered Termination of Employment" provision is as follows:

> **"Covered Termination of Employment"** means the cessation of an Employee's active service with the Employer, other than through the Employee's death, disability or retirement.  Notwithstanding the foregoing, an Employee will not have a Covered Termination of Employment if the Employee voluntarily resigns or if the Employee is terminated by the Employer as a result of the Employee's:
>
> (a) violation of any law,
> (b) insubordination,
> (c) disorderly conduct in the workplace,
> (d) violation of the Employer's alcohol/drug policy,
> (e) unethical or fraudulent conduct,
> (f) violation of corporate compliance policies,
> (g) refusal or failure to comply with job conditions, as set forth by the Employer from time to time (including changes in work schedules or work days),
> (h) attendance-related reasons, or
> (i) performance-related reasons.

A.R. 49-50.

The amount of severance to which an individual is entitled under the Plan depends on their position with the company.  In relevant part, the Plan provides that Group Vice Presidents are entitled to 26 weeks' salary as severance in the event of a "Covered Termination of Employment."  A.R. 53-54.

### B.        Termination and Claim for Benefits

Raphaely worked for Gartner for approximately ten months before Gartner terminated him on November 11, 2019.  The Administrative Record contains one document contemporaneous with the termination: an email Raphaely wrote to an individual named Gene Hall[2] on November 11, 2019 after he was terminated.  *See* A.R. 66.  Raphaely wrote to Hall to discuss his termination and provide "feedback about the situation and how it is being handled."  Raphaely noted that he had been "fired" by "Ken [Allard]" and wrote, "I completely understand that as a leader, Ken can go in another direction without reason—that is his right as a leader."  He continued, "[t]he issue I do have is that I'm not being offered any severance" and disputed Allard's statement that "he's firing me for cause."  Raphaely wrote, "I never received any negative feedback that my performance was an issue."  He also referenced a "company wide engagement survey," the results of which he had not yet seen, and wrote, "[the survey] happened during the rocky period with our writers where they were banding together over fair pay and suggesting that they may unionize . . . [t]he writers haven't been happy with the changes I've implemented and I didn't expect them to [be]."  Raphaely asked Hall to "reconsider Gartner's decision to not offer severance" to him.  A.R. 66.

Hall apparently forwarded Raphaely's email to Gina Formichelli, Gartner's Senior Vice President of Human Resources.  She responded to Raphaely on November 13, 2019, by stating "[g]iven that your separation was for performance related reasons, no severance is available."  A.R. 65.  Formichelli wrote that Gartner was "able to offer [Raphaely] other separation benefits . . . including COBRA subsidy, outplacement services, and waiving recoupment of [Raphaely's] relocation bonus . . . if [Raphaely] sign[s] the separation agreement that had been provided to

---

[2] The parties do not identify Gene Hall or explain his role at Gartner.

3

[him]." A.R. 65. Formichelli explained to Raphaely that "[t]hese are not standard separation terms; they were offered to help you get through the forthcoming transition." *Id.*

On December 16, 2019, Raphaely made a written request for severance benefits under the Plan in the amount of 26 weeks' salary. A.R. 198-99. The Administrator denied the claim in writing on March 4, 2020 on the ground that Raphaely was "disqualifie[d] . . . from being eligible for benefits under the Plan" because his "employment was terminated . . . for performance-related reasons" without further explanation, citing the "Covered Termination of Employment" provision. A.R. 196-97. The letter provided information about Raphaely's right to appeal the denial under the terms of the Plan and notified him of his rights under ERISA. A.R. 197.

**C.    Appeal of the Claim Denial**

Raphaely appealed the Administrator's denial on March 30, 2020 and requested production of 16 categories of documents:

1.   Documents governing the operation [of] the Severance Plan for the years 2018 and 2019.

2.   The annual report for the Severance Plan for the years 2018 and 2019.

3.   The summary plan description for the Severance Plan.

4.   The Severance Plan's annual Financial Report for the years 2018 and 2019.

5.   All documents related to the authorization of any person or committee to administer the Severance Plan for the years 2018 and 2019.

6.   The Rules and Procedures established by the Plan Administrator for the years 2018 and 2019.

7.   A complete copy of the Severance Plan's claim file pertaining to Dorth Rapaely [sic].

8.   A complete copy of all other documentation (whether maintained in hard copy or computer medium) pertaining to or referring to Dorth Raphaely's severance benefit claim, whether or not it is deemed to be part of the "claim file."

9.   A copy of all internal rules, guidelines, protocols, or other similar criteria which were relied upon to make any decision related [to] Dorth Raphaely's severance

benefit benefits [sic].

10. Each document that was submitted, considered, or generated in the course of making all decisions related to Dorth Raphaely's severance benefits, without regard to whether they were relied upon in the decision, including but not limited to the claim manual(s).

11. All documents that constitute a statement of policy or guidance with respect to claim determinations for severance benefit claimants.

12. All documents that reflect any legal opinions obtained regarding the subject of whether Dorth Raphaely (or any other Gartner employee) is entitled to severance benefits under the Severance Plan.

13. All documents that demonstrate that the Severance Plan's processes and safeguards designed to ensure and to verify that severance benefit claims determinations are made in accordance with the terms of the Severance Plan, and that those terms have been applied consistently with respect to similarly situated claimants.

14. All documents created by Gartner in connection with the drafting or creation of the Severance Plan.  This includes, but is not limited to, any documents that discuss, relate or refer to Gartner's intention or purpose in creating the language of the Severance Plan.

15. All documents that evidence the Plan Administrator's grant of discretionary powers.

16. Any and all contracts or other documents under which Dorth Raphaely's severance plan has been established, operated or administered (*see Hughes Salaried Retirees Action Committee v. Administrator of The Hughes Non-Bargaining Retirement Plan*, 72 F.3d 686 [9th Cir. 1995], where the court defined the universe of documents subject to disclosure under ERISA § 104(b)(4) as those "which describe the terms and conditions of the plan, as well as its administration and financial status").

A.R. 190-93.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The Plan responded to the appeal and request for documents on April 17, 2020 and stated that it was producing four groups of documents: 1) a copy of the Plan document dated February 15, 2018; 2) the Plan's IRS Form 5500 for 2018; 3) the Plan's summary plan description; and 4) "[t]he internal documents to which Mr. Raphaely is entitled and upon which the Committee relied, or considered, in determining that Mr. Raphaely was ineligible for benefits under the Plan." A.R. 39-40.

The Plan produced a 120-page document entitled "Employee Survey Results" dated September 2019. A.R. 69-189; *see* Pl.'s Mot. 11 (describing the Plan's April 17, 2020 production of documents). The document is a report of comments from employees "about what they love at Gartner Digital Markets—and what they'd like to see improved," grouped by topics and attributed to individual departments. A.R. 71. The Employee Survey Results includes numerous comments about Raphaely by members of the content team. The comments about Raphaely are uniformly negative and he is the only individual who is repeatedly criticized by name. They include:

- The content team is currently working in a toxic work environment, which began when Dorth rolled out his content strategy. During the strategy rollout meeting, Dorth told the content analysts that if we didn't comply with or agree with the new strategy, he would "help us find a new job", effectively informing us that we should fear redundancy if we dared to question this complete overhaul of our job roles. In the same meeting, he commented on hiring plans in India, and mentioned that hiring there was easier because there is "cheap labor". This is extremely offensive and degrading language. There is a general culture of fear and retaliation in the content team . . . Dorth regularly undercuts and undermines the content managers during meetings, and gives drastically conflicting information regarding new changes or initiatives . . . A.R. 76.

- The sudden 180 in leadership, values, and direction have severely impacted my motivation. Dorth introduced himself and said he's going to make us stressed every day at work and he has. We went from a research team, working to help businesses solve real problems to a faulty production line of marketing copy. A.R. 81.

- The content team's new GVP has had an enormous, demoralizing impact on the whole team, from directors to analysts. A.R. 81.

- Morale is very low . . . Dorth's aggressive goals are intended to drive competition and divide . . . A.R. 83.

- Professionalism: Meetings now have no agenda and suffer the classic pitfalls as a result. Dorth attends fewer than half team

meetings, and when he does he's been on facebook or texting—this sets the tone that he doesn't think our time is worth his attention.  When Ken and Dorth talk about our content they only say how weak it's been and is the reason traffic is down for the sites . . .  A.R. 95.

- Dorth values 'pressure testing' his employees by setting stressful deadlines, attempts to competitively pit the analysts against one another and against the production team, and chronically dismisses the concerns of his team.  Everything he has set into motion in the past few months works to take away from our core principles as GDM analysts, and though our team is made up of capable, hard working writers, I am deeply afraid we are being set up to fail.  A.R. 96.

- At this point it feels like we're succeeding in spite of senior leadership rather than because of them. Dorth is trying really hard to create a competitive rather than collaborative culture. His words and actions have directly resulted in a toxic work environment. He lacks tact and often makes insulting remarks to staff (e.g., making a comment RE: a position on the India team being cheap labor, telling the team "if you don't like it, then leave," undercutting managers in meetings, complaining/making light of employees' concerns to other employees, questioning people on public channels in Slack (often for mistakes he made in Wordpress), but then getting upset when someone asks him a direct question on Slack, making light of sexual assault accusations in the Fantasy Football Slack thread, and many more . . . A.R. 101.

- The management shakeup at Gartner Digital Markets since Anthony's departure has had a profoundly negative impact on everyone, regrettably turning what was once a wonderful place to work into the opposite.  The largest part of that has been the arrival of Dorth Raphaely . . .  A.R. 141.

- I don't trust management specifically because of Dorth Raphaely. He is rash, hasn't a clue how to lead, and wants to generate a culture of competition and meanness . . . [h]e should never have been hired.  A.R. 156.

- My direct manager . . . is also frequently undermined and devalued in public meetings by Dorth.  It is painful to watch and I do not blame her at all for the toxic work environment.  A.R. 161.

On May 4, 2020, Raphaely's counsel sent a second letter to the Administrator appealing the denial of the claim, stating that the purpose of the letter was to "submit evidence and argument in support of his appeal."  A.R. 19-29.  First, counsel disputed that Raphaely's employment was terminated for performance-related reasons and submitted a declaration by Raphaely.  A.R. 23, 26-29 (Raphaely Decl. May 4, 2020).  Raphaely denies that he ever received "feedback indicating

poor performance" or "a performance review indicating poor performance" during his employment.  A.R. 27 (Raphaely Decl. ¶¶ 8, 9).  He states that he received "considerable positive feedback" during his employment and describes compliments and statements about his work by his boss, Ken Allard, and sets forth three positive comments regarding his performance from other Gartner employees.  A.R. 27-28 (Raphaely Decl. ¶¶ 11, 12).

Raphaely also addressed the Employee Survey Results, stating, "I was not made aware of the results of this survey prior to my termination.  The anonymous comments from employees completing the survey were not treated as a performance review prior to my termination.  I am not aware of these comments being used in any quantitative assessment of Gartner management."  A.R. 27 (Raphaely Decl. ¶ 10).

Second, counsel asserted that the Administrator had failed to produce documents regarding Raphaely's work performance that they had previously requested, arguing that this prevented Raphaely "from receiving a full and fair review on appeal."  A.R. 23-24.  Specifically, counsel wrote that "GARTNER has exclusive possession, custody and control over the documents that establish that Mr. Raphaely's employment was NOT terminated for performance-related reasons.  GARTNER has refused to produce those documents." A.R. 23.  Counsel did not identify any particular documents that Gartner had withheld.

Finally, counsel argued that there was no evidence in the administrative record that supported the conclusion that Raphaely had been terminated for performance-related reasons.  A.R. 24.  Counsel specifically addressed the Employee Survey Results, arguing that the survey "was used to determine employee satisfaction" and "is not a 'performance-related' document."  A.R. 24.

On May 13, 2020, Severance Plan Committee member Jim Crane forwarded Raphaely's declaration to Ken Allard, Raphaely's former supervisor, and asked for "any comments or thoughts" for the Committee to consider as part of the appeal.  A.R. 6.  Allard responded in an email on May 18, 2020 in which he wrote:

> I am quite surprised by his claim that he did not receive feedback
> about his performance.  Dorth and I had 1:1 meetings 2-4 times per
> month where I gave him ongoing verbal feedback about his priorities,

8

> leadership style, communication challenges, strategic direction, and performance.  I (and others) also gave him explicit written feedback via e-mail regarding concerns with how he communicated with peers and his team, his struggle to translate high level phrases such as 'act like a media company' into an executable strategy his team understood, and an absence of a content planning process and associated production schedule . . . Dorth, no doubt, received some positive feedback about his initial ideas and a few steps he took to improve his capability gaps.  However, ultimately, his performance did not meet the standards we needed from an executive leader of a critical function.   These shortcomings, coupled with alarming feedback on Dorth's performance received in response to an employee engagement survey, resulted in our decision to terminate his employment.

A.R. 5.

On May 28, 2020, the Administrator notified Raphaely of its denial of his appeal.  A.R. 3-4.  It noted that the Administrator had considered Raphaely's contention that he had not received any feedback indicating poor performance and stated that it found the contention "inaccurate," citing Allard's email to Crane.  Based on this evidence, along with "the negative and concerning comments about Mr. Raphaely's performance from his co-workers that were previously provided" to counsel, the Administrator stated that it "reasonably concluded that Mr. Raphaely was terminated for performance-related reasons."  A.R. 3.

The Administrator also noted Raphaely's contention that Gartner had not produced "necessary documents for Mr. Raphaely to perfect his appeal related to his work performance at Gartner," and responded that "[w]e disagree and are aware of no documents relevant to Mr. Raphaely's appeal that have not already been provided."  A.R. 4.

### D.    Procedural History

Raphaely filed a complaint against Gartner and the Plan on September 8, 2020, alleging two claims for relief: 1) a claim for recovery of plan benefits under 29 U.S.C. § 1132(a)(1)(B); and 2) a claim for breach of fiduciary duties under 29 U.S.C. § 1104.  Defendants moved to dismiss the second claim, arguing that it sought relief that was duplicative of the relief sought in connection with the first claim, which the court denied on December 10, 2020.  [Docket No. 19.]  Now before the court are the parties' cross motions for summary judgment.

## II.    LEGAL STANDARD

The conventional summary judgment standard applies to Raphaely's second claim for

1    relief.  A court shall grant summary judgment "if . . . there is no genuine dispute as to any material

2    fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The burden

3    of establishing the absence of a genuine issue of material fact lies with the moving party, *see*

4    *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the court must view the evidence in the

5    light most favorable to the non-movant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

6    (1986).  A genuine factual issue exists if, taking into account the burdens of production and proof

7    that would be required at trial, sufficient evidence favors the non-movant such that a reasonable

8    jury could return a verdict in that party's favor.  *Id.* at 248.  The court may not weigh the evidence,

9    assess the credibility of witnesses, or resolve issues of fact.  *See id.* at 249.

10        To defeat summary judgment once the moving party has met its burden, the nonmoving

11   party may not simply rely on the pleadings, but must produce significant probative evidence, by

12   affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, supporting the claim that

13   a genuine issue of material fact exists.  *TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809

14   F.2d 626, 630 (9th Cir. 1987).  In other words, there must exist more than "a scintilla of evidence"

15   to support the non-moving party's claims.  *Anderson*, 477 U.S. at 252.  Conclusory statements

16   without factual support are insufficient to defeat a motion for summary judgment.  *Surrell v. Cal.*

17   *Water Serv. Co.,* 518 F.3d 1097, 1103 (9th Cir. 2008).  Similarly, "[w]hen opposing parties tell

18   two different stories, one of which is blatantly contradicted by the record, so that no reasonable

19   jury could believe it, a court should not adopt that version of the facts" when ruling on the motion.

20   *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007).

21        On an issue where the nonmoving party will bear the burden of proof at trial, the moving

22   party can prevail merely by pointing out to the district court that there is an absence of evidence to

23   support the nonmoving party's case.  *Celotex*, 477 U.S. at 324-25; *Soremekun v. Thrifty Payless,*

24   *Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  If the moving party meets its initial burden, the opposing

25   party must then set out specific facts showing a genuine issue for trial in order to defeat the

26   motion.  *Anderson*, 477 U.S. at 250; *Soremekun*, 509 F.3d at 984; *see* Fed. R. Civ. P. 56(c), (e).

27   The opposing party's evidence must be more than "merely colorable" and must be "significantly

28   probative."  *Anderson*, 477 U.S. at 249-50.  Further, the opposing party may not rest upon mere

United States District Court
Northern District of California

10

1   allegations or denials of the adverse party's evidence, but instead must produce admissible

2   evidence showing there is a genuine dispute of material fact for trial.  *Nissan Fire & Marine Ins.*

3   *Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  Disputes over irrelevant or

4   unnecessary facts will not preclude a grant of summary judgment.  *T.W. Elec. Serv.*, 809 F.2d at

5   630.

6          A different standard applies to Raphaely's first claim for benefits under the Plan.  In the

7   ERISA context, summary judgment generally is the vehicle for deciding the case; the factual

8   determination of eligibility for benefits is decided solely on the administrative record and "the

9   non-moving party is not entitled to the usual inferences in its favor."  *Gilliam v. Nevada Power*

10  *Co.*, 488 F.3d 1189, 1192 n.3 (9th Cir. 2007); *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942

11  (9th Cir. 1999) *overruled on other grounds by Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955,

12  965 (9th Cir. 2006) (en banc).

13         Where, as here, the parties have each filed motions for summary judgment, "[e]ach motion

14  must be considered on its own merits."  *Fair Hous. Council of Riverside Cty., Inc. v. Riverside*

15  *Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).  "In fulfilling its duty to review each cross-motion

16  separately, the court must review the evidence submitted in support of each cross-motion."  *Id.*

17  **III.   DISCUSSION**

18         **A.  Claim One: Recovery of Plan Benefits Under 29 U.S.C. § 1132(a)(1)(B)**

19                 **1.       Standard of Review**

20         ERISA allows a participant in an employee benefit scheme to bring a civil action to

21  recover benefits due under the terms of a plan.  29 U.S.C. § 1132(a)(1)(B).  The court applies a de

22  novo standard of review to actions for the recovery of ERISA benefits unless the plan in question

23  grants discretionary authority to the trustee or fiduciary.  *Firestone Tire & Rubber Co. v. Bruch*,

24  489 U.S. 101, 114-15 (1989).  If a plan unambiguously grants the plan administrator discretionary

25  authority to construe the plan's terms, the court reviews the matter for an abuse of discretion.

26  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008).  "Neither the parties nor the courts should

27  have to divine whether discretion is conferred."  *Sandy v. Reliance Standard Life Ins. Co.*, 222

28  F.3d 1202, 1207 (9th Cir. 2000).  "[U]nless plan documents unambiguously say in sum or

United States District Court
Northern District of California

substance that the Plan Administrator or fiduciary has authority, power, or discretion to determine eligibility or to construe the terms of the Plan, the standard of review will be de novo." *Id*.

Defendants argue that the abuse of discretion standard applies to Raphaely's first claim for relief. Defs.' Mot. 15-16. Raphaely does not contend that de novo review is appropriate but argues that "the Court cannot apply a pure abuse-of-discretion standard" due to the existence of a conflict of interest. Pl.'s Mot. 18.

Here, the Plan unambiguously confers discretionary authority to determine eligibility for benefits and construe the terms of the Plan: it provides that the Administrator has the sole right "to construe and interpret the Plan, decide all questions of eligibility, determine the status and rights of Employees, and determine the amount, manner and time of payment of any benefits hereunder[.]" A.R. 44, 48, 56. It further provides that "[t]he decisions of the Administrator with respect to any matter it is empowered to act on shall be made by it in its sole discretion based on the Plan documents and shall be final, conclusive and binding on all persons." A.R. 56-57. The Ninth Circuit has "repeatedly held that similar plan wording—granting the power to interpret plan terms and to make final benefits determinations—confers discretion on the plan administrator." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (en banc) (citations omitted). Since the Plan confers discretion to construe the terms of the Plan and to determine claims regarding eligibility for benefits on the Administrator, the court finds that abuse of discretion review applies. *See id*. at 965.

As to the conflict of interest, Raphaely contends, and Defendants do not dispute, that Gartner funds the Plan from which benefits are paid. Pl.'s Mot. 18; Defs.' Mot. 18-19. *See* A.R. 58 ("The Plan's funding policy and method are to provide benefits from the general assets of the Employer."), 60 ("All benefits under the Plan shall be paid exclusively by the Employer . . ."), 48, 51 (defining "Employer" to mean "the Company" and defining "Company" to mean Gartner). Given that the Plan is funded by Gartner and administered by a Severance Plan Committee comprised of Gartner employees, there is a structural conflict of interest. *Metro. Life Ins. Co.*, 554 U.S. at 112; *see Burke v. Pitney Bowes Inc. Long–Term Disability Plan*, 544 F.3d 1016, 1026 (9th Cir. 2008) (discussing structural conflict of interest that exists when plans are "plans administered

United States District Court
Northern District of California

1    and funded directly by employers"). This is because the employer "both decides who gets benefits

2    and pays for them, so it has a direct financial incentive to deny claims." *Saffon v. Wells Fargo &*

3    *Co. Long Term Disability Plan*, 522 F.3d 863, 868 (9th Cir. 2008).

4           In the Ninth Circuit, the existence of a conflict of interest is a factor to be weighed in

5    determining whether there was an abuse of discretion. *Abatie*, 458 F.3d at 967-69; *Montour v.*

6    *Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 631 (9th Cir. 2009). The presence of a conflict does

7    not convert abuse of discretion review into de novo review, but it means that a reviewing court

8    must consider the "conflict of interest in deciding how skeptical to be of the administrator's

9    decision." *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 675 (9th Cir. 2011). The

10   weight a reviewing court accords to a conflict varies "based on the degree to which the conflict

11   appears improperly to have influenced a plan administrator's decision." *Montour*, 588 F.3d at

12   631. If the facts and circumstances of a particular case "indicate the conflict may have tainted the

13   entire administrative decisionmaking process, the court should review the administrator's stated

14   bases for its decision with enhanced skepticism . . ." *Id.*; *see Nolan v. Heald Coll.*, 551 F.3d 1148,

15   1153 (9th Cir. 2009) ("[A] court is required to consider the conflict whenever it exists, and to

16   temper the abuse of discretion standard with skepticism 'commensurate' with the conflict." (citing

17   *Abatie*, 458 F.3d at 959, 965, 969)).

18                      **2.      Factors Bearing on the Level of Skepticism**

19          The Ninth Circuit has provided guidance in determining how much weight to give to a

20   structural conflict of interest. For example, a court may weigh a conflict more heavily if "the

21   administrator provides inconsistent reasons for denial; fails adequately to investigate a claim or

22   ask the plaintiff for necessary evidence; fails to credit a claimant's reliable evidence; or has

23   repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by

24   making decisions against the weight of evidence in the record." *Abatie*, 458 F.3d at 968-69

25   (internal citations omitted). On the other hand, "[t]he level of skepticism with which a court views

26   a conflicted administrator's decision may be low if a structural conflict of interest is

27   unaccompanied . . . by any evidence of malice, of self-dealing, or of a parsimonious claims-

28   granting history." *Id.* at 968. Additionally, a court may "consider evidence outside the

13

United States District Court
Northern District of California

1    administrative record to decide the nature, extent, and effect on the decision-making process of

2    any conflict of interest." *Id.* at 970.

3         Raphaely does not present any evidence outside the administrative record that bears on the

4    weight to be given to the conflict of interest and instead relies solely on actions taken with respect

5    to his own claim. *Id.* at 19.  He argues that the court should "heavily" weigh the structural conflict

6    "in his favor" for several reasons.  Pl.'s Mot. 18.

7         The court notes that Raphaely's arguments on this point are disorganized and difficult to

8    follow.  For example, even though there are two Defendants, he does not clearly identify which

9    Defendant he contends is responsible for each alleged action.  He repeatedly refers to "Gartner"

10   when referring to actions by the Administrator and/or the Severance Plan Committee, such as the

11   denial of his claim, production of documents, and decision on appeal.  *See* Pl.'s Mot. 10-13.

12   Additionally, Raphaely phrases the following contentions as if they apply to more than one

13   individual, repeatedly using the terms "plaintiffs," "beneficiaries," "claims," and "appeals."  *See*

14   *id.* at 19.  The court assumes that these are typographical errors, as there is nothing in the

15   Administrative Record about Gartner and/or the Administrator/Severance Plan Committee's

16   treatment of individuals other than Raphaely, and Raphaely did not present any such evidence

17   outside the Administrative Record for the court's consideration.

18                          **a.      Failure to Credit Evidence and Argument**

19        First, Raphaely argues that Gartner "ignor[ed] or fail[ed] to give any credit" to evidence

20   and argument he presented in his claim and appeal.  Pl.'s Mot. 19.  As Raphaely presented his

21   claim and appeal to the Administrator, not Gartner, the court construes this argument as a

22   challenge to the Administrator's actions.  It is without merit.  "A court may weigh a conflict more

23   heavily if . . . the administrator . . . fails to credit a claimant's reliable evidence." *Abatie*, 458 F.3d

24   at 968 (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) (holding that

25   even though "plan administrators are not obliged to accord special deference to the opinions of

26   treating physicians" in the ERISA context, they "may not arbitrarily refuse to credit a claimant's

27   reliable evidence, including the opinions of a treating physician")).  In its decision denying the

28   appeal, the Administrator addressed Raphaely's contention that "he did not receive any feedback

14

indicating poor performance" and "found it to be inaccurate" based on Allard's statements that "he addressed performance concerns with Mr. Raphaely on multiple occasions." *See* A.R. 3.  The Administrator was tasked with determining whether Raphaely's termination was a "Covered Termination of Employment" or whether it was for "performance-related reasons."  As part of that inquiry, it was entitled to weigh Raphaely's contentions against statements by his supervisor about his performance and feedback thereon.  Raphaely points to nothing in the record that supports that the Administrator "arbitrarily refuse[d] to credit [Raphaely's] reliable evidence."

### b.    Failure to Investigate Raphaely's Claim and Appeal

Next, Raphaely contends that there was a failure to adequately investigate Raphaely's claim and appeal "by not including a single performance related document or email in the administrative record." Pl.'s Mot. 19.  This is inaccurate.  The Administrative Record contains Allard's description of "ongoing verbal feedback" he gave to Raphaely as well as Allard's assessment of Raphaely's performance, which was provided in response to the Administrator's own request for information to evaluate Raphaely's claim. *See* A.R. 6.  In other words, the Administrator asked Raphaely's supervisor to respond to Raphaely's statements about his performance and then included that response in the Administrative Record.  The Administrative Record also contains the Employee Survey Results dated September 2019, which pre-date the termination, and which contain uniformly negative comments about Raphaely's leadership, strategy, and professionalism by members of his team.  These documents clearly bear on Raphaely's job performance and are "performance related document[s]."

### c.    False or Misleading Statements About Raphaely's Rights

Raphaely next argues that there were "statements that were false and/or misleading, both before and during the claims adjudication period, about Raphaely's rights to pursue benefits under the Plan, his lack of entitlement to Plan benefits, his right to file claims under the Plan, and the purported unavailability of any benefits unless plaintiff[ ] released all of [his] claims against Gartner." Pl.'s Mot. 19.  He also contends that "the management team . . . tried to prevent participants from pursuing claims by prematurely stating that . . . his claim would be denied for performance related issues." *Id.*  Raphaely does not specifically identify any allegedly false and/or

United States District Court
Northern District of California

misleading statements and does not spell out this argument in any detail.  It is possible that Raphaely's argument is based on Formichelli's email following his termination informing him that "no severance is available" because the "separation was for performance related reasons" and offering "other separation benefits" that were contingent on him signing the separation agreement. *See* A.R. 65.  The problem is that Raphaely does not explain how Formichelli's statements were false or misleading, and nothing in the record supports the conclusion that Formichelli (or any other Gartner employee) lied to or mislead him about his benefits.  Rather, it appears undisputed that Gartner offered Raphaely separation benefits to which he was not entitled in exchange for him releasing any claims against Gartner.  He also does not identify any "false and/or misleading" statements by the Administrator in the course of the adjudication of his claim.  Additionally, Raphaely does not point to anything in the Administrative Record that supports his assertion that anyone "tried to prevent [him] from pursuing" his claim.

### d.    Procedural Irregularities

Finally, Raphaely contends that there were "procedural irregularities" that bear on the weight the court should give the structural conflict of interest.  He contends that he was unable to obtain a "full and fair review" of the denial of his claim for severance benefits because 1) Gartner refused to produce documents related to his performance that were under its exclusive possession, custody, and control, and which he requested; 2) Gartner's decision letters failed to provide "the necessary information for a 'meaningful dialogue'"; and 3) Gartner created "new purported evidence after the termination in an effort to support . . . its decisions" and did not produce the evidence until after the decision on appeal was made.  Pl.'s Mot. 16-17, 19.

Section 503 of ERISA, 29 U.S.C. § 1133(2), provides that a claimant is entitled to a "full and fair review" of an adverse benefit determination, and the Department of Labor has issued regulations governing claims procedure requirements.  *See* 29 C.F.R. § 2560.503-1.  The Ninth Circuit has explained that a "procedural irregularity, like a conflict of interest, is a matter to be weighed in deciding whether an administrator's decision was an abuse of discretion." *Abatie*, 458 F.3d at 972.  Therefore, "[w]hen an administrator can show that it has engaged in an ongoing, good faith exchange of information between the administrator and the claimant, the court should

United States District Court
Northern District of California

1   give the administrator's decision broad deference notwithstanding a minor irregularity." *Id.*

2   (cleaned up).  "A more serious procedural irregularity may weigh more heavily." *Id.*

3          Regarding the alleged failure to produce documents, Raphaely states that Gartner

4   "refus[ed] to produce work performance related documents that were under Gartner's exclusive

5   possession, custody and control," and argues that "[t]hose documents would have unequivocally

6   established that Mr. Raphaely's employment was not terminated for performance-related reasons."

7   Pl.'s Mot. 17.  To begin with, his March 30, 2020 letter requesting numerous categories of

8   documents did not include a request for "work performance related documents" or otherwise

9   request documents that fell within that category.  *See* A.R. 190-93.  The Administrator provided

10  "[t]he internal documents to which Mr. Raphaely is entitled and upon which the Committee relied,

11  or considered, in determining that Mr. Raphaely was ineligible for benefits under the Plan."  A.R.

12  39-40.  Importantly, Raphaely does not specify what information, if any, was missing.  *See*

13  *Hoskins v. Bayer Corp.*, 564 F. Supp. 2d 1097, 1104 (N.D. Cal. 2008) (where the plaintiff did not

14  submit evidence showing what information any alleged missing documents contained or that

15  documents were missing as a result of the defendant's conduct, holding that there was no showing

16  that the defendant was "self-dealing or otherwise acting in bad faith" for purposes of determining

17  the level of skepticism to apply to exercise of discretion).  Given the brief tenure of his

18  employment, which was less than 12 months, it is not surprising that Gartner did not have more

19  extensive documentation of Raphaely's job performance, such as performance reviews or other

20  similar documents.  Raphaely also does not identify any particular procedural requirement

21  breached by Gartner and/or the Administrator.

22          Next, Raphaely contends that Gartner failed to provide "information that would permit for

23  a meaningful dialogue" in its letters denying his claim.  Pl.'s Mot. 16-17.  He cites *Booton v.*

24  *Lockheed Medical Ben. Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997), in which the Ninth Circuit

25  explained that ERISA regulations require "meaningful dialogue between ERISA plan

26  administrators and their beneficiaries.  If benefits are denied in whole or in part, the reason for the

27  denial must be stated in reasonably clear language, with specific reference to the plan provisions

28  that form the basis for the denial; if the plan administrators believe that more information is

needed to make a reasoned decision, they must ask for it." (citing 29 C.F.R. § 2560-503-1(f)). According to Raphaely, "Gartner's decision letters did not provide the necessary information for a 'meaningful dialogue,' despite the fact that [he] pointed out this error and requested that it be corrected." Pl.'s Mot. 17. Setting aside the fact that the "decision letters" were from the Administrator, not Gartner, *see* A.R. 196-97, 3-4, Raphaely does not explain how the letters failed to satisfy the applicable regulation. The Administrator's denial letters each referred to the relevant provisions of the Plan and offered the specific reason for the denial, that is, that the termination was for performance-related reasons and thus was not a "Covered Termination of Employment" entitling him to benefits. They also informed Raphaely of the appeal process. *See* A.R. 196-197, 3-4.

This case is distinguishable from *Booton*. In that case, the plaintiff requested medical insurance coverage after she was kicked in the mouth by a horse, leaving four front teeth "hanging from her gums." 110 F.3d at 1462. Her plan covered "accidental injury to natural teeth" but excluded ordinary dental work. *Id*. The dental procedure required work on her rear teeth, which were not injured, and the insurer denied the claim for work related to the rear teeth on the ground that they had not been injured. *Id*. In response to the denial, the plaintiff tried to explain the connection between her injury and the work performed on her back teeth, but the insurer repeatedly denied the claim. *Id*. Her consulting dentist noted which records the insurer should request and stated that pre-injury x-rays would help to substantiate the plaintiff's claim, but the insurer never requested the dental records and did not follow up on the consulting dentist's opinion. *Id*. She later received a two-page letter denying her claim, which stated: "[I]t has been determined . . . that some of the dental work claimed . . . was not the result of an accidental injury." *Id*. at 1463. The plaintiff filed suit, lost on summary judgment, and appealed to the Ninth Circuit. *Id*.

The court held that the insurer "denied benefits without a rational explanation," failed to even acknowledge the plaintiff's argument that "her back teeth needed work on account of the injury to her front teeth," failed to ask for key records such as pre-accident x-rays, and noted that the "record shows that plaintiff's dentists were ready and able to explain their work but no one at

1    [the insurer] sought their explanations." *Id.*  The court reversed, holding that "to deny the claim

2    without explanation and without obtaining relevant information" was an abuse of discretion.  *Id*. at

3    1464.

4              In contrast to *Booton*, Raphaely does not identify any key documents or "relevant

5    information" that would have borne on the Administrator's decision.  For example, he does not

6    identify documents or information that contradict his supervisor's claim that "his performance did

7    not meet the standards [Gartner] needed from an executive leader of a critical function," *see* A.R.

8    5, or that undermine the Administrator's conclusion that the termination was related to his

9    performance.  Nothing in the record before the court suggests that the Administrative Record is

10   missing key documents.  To be sure, the Administrator's letter denying his initial claim for

11   benefits lacked any detail supporting the conclusion that he was terminated for performance-

12   related reasons.  A.R. 196-97.  It was not until the decision denying his appeal that the

13   Administrator offered any further explanation, citing both the Employee Survey Results and

14   Allard's email.  A.R. 3-4.  The delay between the March 4, 2020 claim denial and the

15   Administrator's production of documents related to his job performance on April 17, 2020 is

16   noteworthy, particularly because Raphaely had immediately protested his termination "for cause"

17   in an email sent the same day as his termination.  However, given that Raphaely expressly

18   referenced the Employee Survey Results in the email he sent on November 11, 2019 shortly after

19   he was fired, *see* A.R. 66, it appears that he was already on notice that those survey results

20   contributed to his termination and by extension, the Administrator's determination that his

21   employment was terminated for performance-related reasons.  Raphaely does not argue or

22   otherwise explain how the decisions failed to satisfy the standard set forth in *Booton*.

23             Finally, Raphaely contends that Gartner created "new purported evidence after the

24   termination in an effort to support . . . its decisions" and did not produce the evidence until after

25   the decision on appeal was made.  Pl.'s Mot. 17.  This appears to be a reference to Allard's May

26   18, 2020 email in response to the Severance Plan Committee's request for information.  *See* A.R.

27   5-6.  This email does not demonstrate a procedural irregularity in the handling of Raphaely's

28   claim; to the contrary, the Ninth Circuit has held that it is a decisionmaker's duty to adequately

investigate a claim, including asking for more information if "needed to make a reasoned decision." *See Booton*, 110 F.3d at 1463.[3]   That is what happened here.

In sum, Raphaely has not shown any procedural irregularities that justify reducing the deference owed to the Administrator's decision. *See Abatie*, 458 F.3d at 972 ("[a] procedural irregularity, like a conflict of interest, is a matter to be weighed in deciding whether an administrator's decision was an abuse of discretion.").

Given the existence of a structural conflict, the court will weigh the conflict as a factor when applying the abuse of discretion standard.  Since Raphaely has not offered evidence supporting a high level of skepticism in light of the structural conflict, such as evidence "of malice, of self-dealing, or of a parsimonious claims-granting history," the court views the "conflicted administrator's decision" with a low amount of skepticism. *See Hoskins*, 564 F. Supp. 2d at 1105.

### 3.    The Administrator's Exercise of Discretion

In applying an abuse of discretion standard, the court's review is limited to the record before the plan administrator. *Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1110 (9th Cir. 2003) (citing *McKenzie v. General Tel. Co.,* 41 F.3d 1310, 1316 (9th Cir. 1994)).  Under the abuse of discretion standard, a plan administrator's decision "will not be disturbed if reasonable." *Day v. AT&T Disability Income Plan*, 698 F.3d 1091, 1096 (9th Cir. 2012) (quotation omitted).  The court must uphold an administrator's decision unless it is "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 929 (9th Cir. 2012) (quoting *Salomaa*, 642 F.3d at 675).

The issue before the court is whether the Administrator's decision to deny Raphaely severance benefits was reasonable.  As noted, the Plan provides that termination of an employee for "performance-related reasons" is not a "Covered Termination of Employment," and in that circumstance, the employee is not eligible for severance benefits.  While the Plan does not define

---

[3] The court also notes that the Administrator produced the Employee Survey Results on April 17, 2020, before Raphaely appealed the denial of his claim.

United States District Court
Northern District of California

1   the term "performance-related reasons," Raphaely does not argue that the term is vague or

2   ambiguous.  The Administrator appeared to equate "performance-related reasons" with "poor

3   performance," which is not unreasonable.  *See* A.R. 29 (Raphaely Decl. ¶ 13) ("I submit that

4   Gartner's present assertion that I was terminated for poor performance is inconsistent with all of

5   the information provided about my performance during my entire employment with Gartner.").

6          After the Administrator received Raphaely's declaration disputing that he was terminated

7   for poor performance, it asked his supervisor to review and respond to the declaration.  Ultimately,

8   the evidence before the Administrator on appeal included Raphaely's declaration, Allard's

9   response thereto and his own assessment of Raphaely's performance, and the Employee Survey

10  Results.  Additionally, the Administrator had Formichelli's email to Raphaely shortly after his

11  termination stating that he had been terminated for "performance related reasons."  *See* A.R. 3

12  (describing the evidence the Administrator considered, including "all the information provided by

13  [Raphaely]").  With the exception of Raphaely's declaration, the evidence unequivocally

14  supported the conclusion that Raphaely's termination was for performance-related reasons.  In

15  particular, Allard stated that Raphaely's performance was below standards and the Employee

16  Survey Results contained uniformly negative criticism of Raphaely, including that he had created

17  a "toxic work environment," was unprofessional, demoralizing, and "hasn't a clue how to lead."

18         Based on this evidence, and taking into account the structural conflict of interest, the court

19  finds that the Administrator reasonably concluded that Raphaely was terminated for performance-

20  related reasons and therefore ineligible for severance benefits under the Plan.

21         **B.        Claim Two: Breach of Fiduciary Duties Under 29 U.S.C. § 1132(a)(3)**

22         Raphaely's second claim for relief is for breach of fiduciary duties pursuant to ERISA §

23  502(a)(3), 29 U.S.C. § 1132(a)(3).  The parties cross-move for summary judgment on this claim.

24  Pl.'s Mot. 20-21; Defs.' Mot. 19.

25         ERISA requires fiduciaries to discharge their duties "with respect to a plan solely in the

26  interest of the participants and beneficiaries and . . . for the exclusive purpose of: (i) providing

27  benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of

28  administering the plan."  29 U.S.C. § 1104(a)(1)(A).  It authorizes a plan participant to bring a

United States District Court
Northern District of California

civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan[.]"  29 U.S.C. § 1132(a)(3).  This includes requests for equitable relief for a plan administrator or sponsor's breach of fiduciary duty.  *Varity Corp. v. Howe*, 516 U.S. 489, 515 (1996) (Section 1132(a)(3) authorizes beneficiaries to bring lawsuits for "'appropriate' equitable relief" for breach of fiduciary obligations).

### 1.  Raphaely's Motion for Summary Judgment

Raphaely moves for summary judgment on his breach of fiduciary duties claim.  He devotes less than two full pages to the claim in his opening brief and his briefing is singularly unhelpful.  *See* Pl.'s Mot. 20-21.  Raphaely contends that "Gartner breached their fiduciary duties to plaintiff in many respects, including by" and then lists three numbered points, implying that the list is not exhaustive.  He identifies the following breaches, which the court quotes in their entirety:

1. Failing to administer plaintiff's benefit claim and appeal solely in the interest of the Plan's participants and beneficiaries, and instead administering those claims and appeals solely for the benefit of Gartner, with the primary purpose and interest of saving money for Gartner, including by prematurely informing plaintiff that his claim would be denied before any claim had been made and that the only way plaintiff could obtain reduced severance payments was to release all claims against Gartner in exchange for a fraction of the benefits to which he was entitled under the Plan;

2. Failing to inform plaintiff of his rights under the Plan and under ERISA, including plaintiffs' right to file benefits claims and appeals, and their right to bring suit under ERISA for the wrongful denial of those claims and appeals and for defendants' breaches of fiduciary duty; and

3. Wrongfully denying plaintiff's benefits claims and wrongfully denying plaintiff's appeals from those denials without conducting an investigation or considering

1          plaintiff's evidence and arguments, and depriving plaintiff of his rights under the

2          Plan and under ERISA for arbitrary and capricious reasons, in bad faith, and

3          contrary to the Plan language.

4    Pl.'s Mot. 20-21.

5          Raphaely does not cite evidence or anything in the Administrative Record to support any

6    of the alleged breaches, does not identify which individual acting on behalf of which Defendant

7    committed any of the alleged breaches, and does not cite any authority supporting the contention

8    that any of the vaguely-identified acts are actionable breaches.  The sole "analysis" in the motion

9    is a citation to *King v. Blue Cross & Blue Shield of Illinois*, 871 F.3d 730, 744 (9th Cir. 2017), in

10   which the Ninth Circuit held that "[a] fiduciary has an obligation to convey complete and accurate

11   information material to the beneficiary's circumstance, even when a beneficiary has not

12   specifically asked for the information" and that "fiduciaries breach their duties if they mislead plan

13   participants or misrepresent the terms or administration of a plan."  *See* Pl.'s Mot. 20.

14         Given the absence of an adequate identification of the specific alleged breaches, the failure

15   to cite evidence or the Administrative Record to support the alleged breaches, and the lack of any

16   meaningful discussion, Raphaely has failed to show that he is entitled to judgment on this claim as

17   a matter of law.  His motion is denied as to this claim.

18              **2.      Defendants' Motion for Summary Judgment**

19         Defendants move for summary judgment on the breach of fiduciary duties claim on several

20   grounds.  They note the complaint's allegations that Defendants breached their fiduciary duties by

21   "(a) failing to advise [Raphaely] of his rights under the Plan and under ERISA, (b) failing to

22   administer the Plan pursuant to the Plan terms and applicable Department of Labor regulations, (c)

23   committing wholesale and flagrant violations of the procedural requirements of ERISA, and (d)

24   providing him false and/or misleading information regarding his rights under the Plan and under

25   ERISA."  Defs.' Mot. 23 (quoting Compl. ¶ 30).  They argue that each of the alleged breaches fail

26   as a matter of law because 1) none of the alleged breaches are actionable under ERISA; 2) the

27   claim is premised on Gartner breaching a fiduciary duty (as opposed to the Plan) and that Gartner

28   is not a fiduciary under ERISA as a matter of law; and 3) the claim is duplicative of Raphaely's

United States District Court
Northern District of California

23

1    claim for benefits under section 1132(a)(1)(B).  *See id.* at 19-25.

2        Raphaely's response to these arguments is brief.  He addresses only one purported breach,

3    as follows:

> Gartner did breach its fiduciary duties.  It is undisputed that
> Defendants, in an effort to avoid liability under the self-funded
> severance Plan, offered Raphaely a severance package that was
> considerably less than what the Plan required without advising [him]
> of his rights under the Plan, in exchange for signing a release of all
> claims that he might have against Defendants.

7    Pl.'s Reply 10.  Raphaely argues that "[a] fiduciary cannot make an offer to settle a severance

8    claim and release all other possible claims before a claim is made, or during the claim or appeal,

9    because it violates the fiduciary's duty to process the claim 'solely in the interests of the

10   participants,'" but does not cite any authority for his argument.  *See id.*

11       As an initial matter, Raphaely does not address the other breaches alleged in the complaint

12   and thus concedes them.

13       Regarding the claim that one or both Defendants offered him a severance package that was

14   "less than what the Plan required" without advising him of his rights under the Plan in exchange

15   for a release of claims against Defendants, Raphaely cites no evidence of such an offer and does

16   not identify which person(s) took this action on behalf of which Defendant.  Raphaely's detailed

17   May 4, 2020 declaration does not address this interaction at all.  In a second declaration, dated

18   May 8, 2020, Raphaely states only that "[o]n November 11, 2019, Gartner made me an offer to

19   settle my severance claim and release all other possible claims I had against Gartner."  *See* A.R. 8,

20   26-29.  This is inadequate.  To defeat summary judgment, Raphaely must produce evidence

21   supporting the claim that a genuine issue of material fact exists.  *See TW Elec. Serv., Inc.*, 809

22   F.2d at 630.  Conclusory statements without factual support, like those in Raphaely's briefing, are

23   insufficient to defeat a motion for summary judgment.  *Surrell*, 518 F.3d at 1103.

24       Liberally construing Raphaely's briefs, it is possible that this claim is based on

25   Formichelli's email to Raphaely informing him that "no severance is available" because the

26   "separation was for performance related reasons" and offering him "other separation benefits" that

27   were contingent on him signing the separation agreement.  *See* A.R. 65.  The problem with such

28   an argument is that, as noted above, he offers no authority for his position that the statements in

1   Formichelli's email that he could receive certain separation benefits only if he released his claims

2   against Gartner constitute an actionable breach of a fiduciary duty or otherwise violate ERISA.

3   Even assuming for the sake of argument that Formichelli's statements could constitute a

4   breach of fiduciary duty, there is no evidence in the record that Formichelli made the statements

5   on behalf of a fiduciary. "To establish an action for equitable relief under ERISA section

6   502(a)(3), 29 U.S.C. § 1132(a)(3), the defendant must be an ERISA fiduciary acting in its

7   fiduciary capacity, and must "violate [ ] ERISA-imposed fiduciary obligations[.]" *Mathews v.*

8   *Chevron Corp.*, 362 F.3d 1172, 1178 (9th Cir. 2004) (citing *Varity*, 516 U.S. at 498, 506). While

9   Defendants admit that the Plan is a fiduciary, *see* Defs.'s Reply 7 n.5, there is no evidence in the

10  record that Formichelli acted on behalf of the Plan. As to Gartner, Defendants dispute that it is a

11  fiduciary. Defs.' Mot. 20-21; Defs.' Reply 2-4. Raphaely responds to Defendants' argument that

12  Gartner is not a fiduciary that may be held liable under ERISA without citing any legal authority

13  whatsoever. *See* Pl.'s Reply 2-4.

14  In sum, Raphaely has not produced any evidence supporting his claim that a genuine issue

15  of material fact exists with respect to his breach of fiduciary duties claim. Accordingly,

16  Defendants' motion for summary judgment is granted as to his second claim for relief.

## IV.   CONCLUSION

18  For the foregoing reasons, Defendants' motion for summary judgment is granted.

19  Raphaely's motion for summary judgment is denied. The Clerk shall enter judgment in

20  Defendants' favor and close this case.

22  **IT IS SO ORDERED.**

23  Dated: August 17, 2022



Donna M. Ryu
United States Magistrate Judge

United States District Court
Northern District of California